# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MICHELLE LYNN BLANKEN,** | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | Civil Action No. 2:13cv00050 |
| | ) | **MEMORANDUM OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | By: Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Michelle Lynn Blanken, ("Blanken"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the

-1-

case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Blanken protectively filed her application[1] for SSI[2] on August 6, 2009, alleging disability as of September 24, 2009,[3] due to bipolar disorder, mood swings, paranoia, insomnia, auditory hallucinations, migraines and neck pain. (Record, ("R."), at 214-16, 217-18, 234, 264.) The claims were denied initially and on reconsideration. (R. at 128-30, 134-38, 140-44, 145-46, 148-50, 152-54.) Blanken then requested a hearing before an administrative law judge, ("ALJ"). (R. at 155-56.) The hearing was held on January 18, 2012, at which Blanken was represented by counsel. (R. at 38-94.)

By decision dated March 12, 2012, the ALJ denied Blanken's claim. (R. at 23-33.) The ALJ found that Blanken had not engaged in substantial gainful activity since August 26, 2009, the date of her application. (R. at 25.) The ALJ determined that the medical evidence established that Blanken suffered from severe impairments, including bipolar disorder, depression, a history of substance abuse, personality disorder and migraines, but he found that Blanken did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25-27.) The ALJ found

---

[1] Blanken also protectively filed prior applications for disability insurance benefits, ("DIB"), and SSI on November 23, 2004, alleging disability as of October 15, 2004. (R. at 98-99.) By decision dated April 19, 2007, these claims were denied. (R. at 45, 98-103.)

[2] Blanken also filed an application for DIB. However, it was denied because she had not worked long enough to earn Social Security credits. (R. at 128-30.)

[3] At her hearing, Blanken amended her alleged disability date to September 24, 2009. (R. at 46.) Although Blanken listed November 15, 2008, as her alleged onset date in her current application for SSI, she confirmed at her hearing that it was September 24, 2009. (R. at 46, 214.)

that Blanken had the residual functional capacity to perform a full range of work at all exertional levels, but with nonexertional limitations. (R. at 27-31.) Specifically, he found that Blanken could perform simple, routine and repetitive tasks in a work environment free of fast-paced production requirements, involving only simple work-related decisions and routine workplace changes, and in an environment requiring no more than occasional interaction with the public and with co-workers. (R. at 27-31.) The ALJ found that Blanken was able to perform her past relevant work as a kennel cleaner. (R. at 31.) Based on Blanken's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that Blanken could perform other jobs existing in significant numbers in the national economy, including jobs as a dishwasher, a laundry/drycleaner worker and a vehicle cleaner. (R. at 32.) Therefore, the ALJ found that Blanken was not under a disability as defined under the Act and was not eligible for benefits. (R. at 33.) *See* 20 C.F.R. § 416.920(f),(g) (2014).

After the ALJ issued his decision, Blanken pursued her administrative appeals, (R. at 17-18), but the Appeals Council denied her request for review. (R. at 1-5.) Blanken then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2014). The case is before this court on Blanken's motion for summary judgment filed May 7, 2014, and the Commissioner's motion for summary judgment filed June 12, 2014.

## II. Facts[4]

Blanken was born in 1971, (R. at 214), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). She completed the eleventh grade,[5] and received her General Equivalency Development diploma, ("GED"). (R. at 58, 85.) Blanken has past work as a clerk/cashier, a certified nursing assistant, ("CNA"), and a kennel cleaner. (R. at 86.) She stated she had panic attacks twice daily, severe mood swings, heavy depression and paranoia. (R. at 53, 58, 65.) Blanken testified that she got nervous and anxious around crowds, causing her to stay home. (R. at 54.) She stated that there were times she would not leave her house for a week at a time and that she did not get out of bed two or three days each week due to fatigue and depression. (R. at 64, 68.) Blanken stated she had difficulty holding a job due to anger management issues and difficulty getting along with others. (R. at 54-55.) She stated that she previously had been diagnosed with bipolar disorder, but she self-medicated with alcohol because medications had not helped her condition. (R. at 55-56.)

Blanken testified that she had a physically and emotionally abusive father and ex-husband and that she previously had been raped. (R. at 56-57.) She stated that she experienced nightmares every night despite taking Haldol. (R. at 60.) She admitted to suicidal ideations and probably would kill herself if it were not for her

---

[4] Blanken does not challenge the ALJ's finding with respect to her alleged physical impairments. Therefore, the discussion of the medical evidence will be limited to those records pertaining to Blanken's mental health. Further, the undersigned's consideration of medical records is limited to those pertinent to the relevant time period of September 24, 2009, the alleged disability onset date, through March 12, 2012, the date of the ALJ's decision. To the extent that medical records pertaining to dates not pertinent to the relevant time period are contained herein, it is for clarity of the record.

[5] Blanken testified that she quit school within two weeks of graduation. (R. at 58.)

son.  (R. at 59, 68.)  She testified that her mind raced all the time and that, despite taking medications, she heard voices constantly, which prevented her from completing tasks.  (R. at 60, 63.)  Blanken testified that her college-aged son lived with her.  (R. at 60.)  She stated that she became "pretty violent" when angry, admitting that she ran over her ex-husband[6] with a car.  (R. at 61.)  Blanken explained that she had a "horrible, horrible temper."  (R. at 76.)

Blanken testified that she willingly had undergone substance abuse treatment for 10 months, which helped.  (R. at 76-77.)  However, she testified that she no longer considered herself an alcoholic or addict.  (R. at 77.)  She explained that she was self-medicating with alcohol, but the last time she had consumed an alcoholic beverage was in November 2011, when she had one glass of champagne.  (R. at 77-78.)  She stated that it had been so long since she had used any pain medications, Ritalin or marijuana that she could not remember when it was.  (R. at 78.)  Blanken testified that she had enjoyed painting pictures in the past, but could no longer do so due to hand tremors.  (R. at 65-66.)  She stated that she had two dogs, which she fed and watered.  (R. at 72.)

AnnMarie Cash, a vocational expert, also was present and testified at Blanken's hearing.  (R. at 84-90.)  Cash classified Blanken's past work as a clerk/cashier as light[7] and semi-skilled, as a CNA as medium[8] and semi-skilled and

---

[6] Blanken testified that her divorce was not final because her husband could not be found due to his status as an "alcoholic junkie."  (R. at 62.)

[7] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds.  If an individual can perform light work, she also can perform sedentary work.  *See* 20 C.F.R. § 416.967(b) (2014).

[8] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If an individual can perform medium work, she also can perform light and sedentary work.  *See* 20 C.F.R. § 416.967(c) (2014).

as a kennel cleaner as medium and unskilled. (R. at 86.) Cash testified that an individual of Blanken's age, education and work experience, who had no exertional, postural, manipulative, environmental, visual or communicative limitations, but who would be limited to simple, routine and repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple work-related decisions and routine workplace changes, could perform Blanken's past work as a kennel cleaner. (R. at 86.) She further testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a dishwasher, a laundry/drycleaner worker and a vehicle cleaner. (R. at 87.) Cash testified that employers customarily expected no more than two absences per month from employees, and exceeding these limitations on a regular basis would eliminate the jobs cited in the available work in a competitive workplace. (R. at 87.) Cash testified that an individual would be allowed to be off task no more than 20 percent during a workday in addition to regularly scheduled breaks and be able to maintain competitive employment. (R. at 87-88.) Cash next testified that the same hypothetical individual as previously described, but who also would be limited to only occasional interaction with the public and with co-workers, could perform Blanken's past work as a kennel cleaner, as well as other jobs existing in significant numbers in the national economy, including those of a dishwasher, a laundry/drycleaner worker and a vehicle cleaner. (R. at 88-89.) Cash also testified that the same hypothetical individual, but who would need to be isolated from the public, with only occasional supervision and only occasional interaction with co-workers, would not be able to perform Blanken's past work as a kennel cleaner, nor would she be able to perform any competitive work. (R. at 89-90.)

In rendering his decision, the ALJ reviewed records from Bristol Regional Medical Center; Dr. Uzma Ehtesham, M.D.; Ridgeview at Bristol Regional Medical Center; Wise County Behavioral Health Services; Lee County Behavioral Health Services; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Julie Jennings, Ph.D., a state agency psychologist; Joseph Leizer, Ph.D., a state agency psychologist; Lonesome Pine Hospital; Addiction Recovery Center of East Tennessee; and Robert Spangler, Ed.D., a licensed psychologist. Blanken's counsel submitted additional medical records from Dr. Ehtesham to the Appeals Council.[9]

On July 30, 2009, Blanken was admitted to Ridegview at Bristol Regional Medical Center, ("Ridgeview"), on a temporary detention order, for suicidal ideations and self-inflicted lacerations. (R. at 313-81.) She reported not having taken any antipsychotic medications for approximately one and one-half years due to losing her insurance. (R. at 321.) Blanken reported hearing voices telling her that she was better off dead and to "pack her stuff and go away." (R. at 317.) She further reported hearing her deceased dog and thinking the dog was still in her house. (R. at 317.) She stated that she felt like someone was standing behind her all the time, and she saw shadows in her peripheral vision. (R. at 317.) She was able to do serial 3's and to interpret proverbs correctly, and her intelligence was deemed to be within normal limits. (R. at 318.) Blanken reported drinking in the past, but being sober for a year[10] until the previous month. (R. at 326.) Despite

_____

[9] Since the Appeals Council considered and incorporated this evidence into the record in reaching its decision, (R. at 1-5), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

[10] There is another notation which reflects that Blanken stated that she had quit drinking two years prior to her admission. (R. at 366.)

Case 2:13-cv-00050-PMS   Document 20   Filed 02/12/15   Page 7 of 28   Pageid#: 616

this statement, she also stated that she drank six beers the previous night. (R. at 366.) She reported that she sometimes took Lortab and smoked marijuana to self-medicate when she could not afford her prescriptions. (R. at 327.) Blanken was diagnosed with bipolar disorder, currently depressed with psychotic features; history of alcohol dependence; and a then-current Global Assessment of Functioning, ("GAF"),[11] score of 25.[12] (R. at 319.) Her prognosis was deemed fair with treatment. (R. at 319.) Blanken received counseling during her stay at Ridgeview. (R. at 330-34.)

On August 1, 2009, Dr. Maria T. Liquete, M.D., a psychiatrist at Ridgeview, evaluated Blanken. (R. at 315-20.) Blanken reported, among other things, increasing severity of mood swings, irritability, racing thoughts and significant anxiety since being off of her medications. (R. at 321.) However, she reported no psychotic symptoms. (R. at 321.) Blanken insisted on being placed back on Klonopin. (R. at 321.) A drug screen was positive for benzodiazepines, marijuana and opiates. (R. at 321, 337-38.) Blanken minimized her drug and alcohol problems. (R. at 321.) While she admitted to being on Suboxone once in the past, she denied any problems with addiction, insisting that she had not used any addictive substances in several days. (R. at 321-22.) Dr. Liquete diagnosed bipolar disorder, currently mixed; alcohol dependence; rule out polysubstance

---

[11] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[12] A GAF score of 21 to 30 indicates that the individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment … OR inability to function in almost all areas…." DSM-IV at 32.

dependence; and a then-current GAF score of about 20[13] to 30. (R. at 373.) By August 4, 2009, Blanken's mood showed marked improvement. (R. at 334.) She was discharged on that date with diagnoses of bipolar disorder; possible opiate and benzodiazepine abuse; and a then-current GAF score of 50[14] to 55[15]. (R. at 313.) Blanken was prescribed Depakote, Ambien, Seroquel, hydroxyzine and Cymbalta, and she was advised to follow up with Wise County Behavioral Health Services and to abstain from addictive substances. (R. at 313.)

Blanken presented to Wise County Behavioral Health Services for intake on August 6, 2009. (R. at 388-91.) She reported an inability to complete activities of daily living due to depression. (R. at 388.) Blanken reported prior mental outpatient treatment by Dr. Ehtesham, a pscychiatrist, one to two years previously. (R. at 388.) She stated that she had not taken her medication since the termination of her insurance, approximately a year and a half previously. (R. at 388.) Blanken reported that her father was abusive to her as a child. (R. at 388.) She endorsed, among other things, mild delusions, hallucinations and paranoid ideation, moderate panic attacks, depressed mood and marked mood shifts and severe aggression or rage, anxiety and racing thoughts. (R. at 388.) Blanken admitted to having used alcohol and marijuana in the past. (R. at 389.) She was diagnosed with polysubstance dependence; mood disorder, not otherwise specified; alcohol

---

[13] A GAF score of 11 to 20 indicates that the individual is in "[s]ome danger of hurting self or others … OR occasionally fails to maintain minimal personal hygiene … OR gross impairment in communication. …" DSM-IV at 32.

[14] A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" DSM-IV at 32.

[15] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

dependence; rule out bipolar disorder versus major depressive disorder; and substance induced mood disorder.  (R. at 389.)

On August 16, 2009, Blanken was evaluated at Addiction Recovery Center of East Tennessee.  (R. at 480.)  She reported that her drugs of choice were hydrocodone and alcohol, but stated that she also used marijuana, Ritalin and Valium daily.  (R. at 480.)  She also stated that she had used Lortab for 10 years. (R. at 480.)  Blanken stated that she currently was prescribed Geodon, Seroquel and Cymbalta and that she had received prior Suboxone treatment.  (R. at 480.)

On August 27, 2009, Blanken saw Stephanie Austin, B.S., a social worker at Wise County Behavioral Health Services.  (R. at 383.)  She reported not doing well, and, because she was out of Seroquel, that she had smoked marijuana and had taken half of a 7.5 mg. Lortab the prior day.  (R. at 383.)  However, Blanken reported taking her medications as prescribed until running out of Seroquel.  (R. at 383.)  She denied any suicidal or homicidal ideations, as well as auditory or visual hallucinations.  (R. at 383.)  Blanken was alert and fully oriented, and her speech was clear and coherent.  (R. at 383.)  Her thoughts appeared logical and organized, but she appeared to be very guarded.  (R. at 383.)  Blanken's mood was angry and anxious with a congruent affect.  (R. at 383.)  She maintained good eye contact and conversed openly with the case manager.  (R. at 383.)

Dr. Rhonda K. Bass, M.D., a psychiatrist at Wise County Behavioral Health Services, also saw Blanken on August 27, 2009.  (R. at 384-87.)  Blanken was not forthcoming with historical details of her psychiatric history and was very evasive and guarded.  (R. at 384.)  Dr. Bass noted that Blanken lived with her boyfriend, who was an active abuser of pain pills.  (R. at 384.)  Blanken stated that her last

alcoholic drink was five years previously, which medical reports proved inaccurate. (R. at 384.) She denied a history of alcohol dependence despite a diagnosis in 2004, at which time she requested alcohol detoxification, stating that she had been drinking daily for about 10 years. (R. at 384.)

Dr. Bass questioned Blanken's diagnosis of bipolar disorder, depressed with psychotic features, and noted that she had received outpatient services from a psychiatrist who had a tendency to freely diagnose bipolar disorder and prescribe patients on multiple medication regimens. (R. at 384.) Blanken reported that Seroquel and Depakote were helping her mood, but her concentration and memory were poor, and her mood was irritable. (R. at 384.) She denied suicidal or homicidal ideations, and no mania was reported, but she reported hearing voices at the time of her recent hospitalization, irregular sleep and a history of alcohol dependence. (R. at 385.) Blanken's eye contact was fair, psychomotor movement was within normal limits, speech was normal, thought content was normal, thought process was goal-directed, and she was alert. (R. at 385-86.) Rapport was absent, Blanken was guarded, evasive and provided ambiguous answers, her appearance was mildly disheveled, mood was irritable and guarded with congruent affect, and she expressed a negative attitude toward the interviewer. (R. at 385-86.) Dr. Bass diagnosed Blanken with rule out substance induced mood disorder, not otherwise specified, substance induced; rule out bipolar disorder versus major depressive disorder; alcohol dependence versus alcohol abuse; nicotine dependence; rule out borderline personality disorder; and a then-current GAF score of 50. (R. at 386.) Dr. Bass prescribed Depakote, Cymbalta and Seroquel. (R. at 386.) Dr. Bass noted her uncertainty whether Blanken's memory problems were the result of a traumatic brain injury from frequent falls/domestic violence or alcohol abuse/dependence.

-11-

(R. at 386.) She advised her to continue individual therapy on a regular basis. (R. at 386.)

On September 11, 2009, Blanken advised Wise County Behavioral Health Services that her ex-husband had come to her house the prior night and "lost his mind," throwing all of her medications into the yard and down the toilet. (R. at 404.) A notation in the records dated September 16, 2009, reflects that Blanken had called Lee County Behavioral Health Services numerous times over the previous several days regarding her need for medications due to this incident. (R. at 404.) Although Blanken was informed the previous day to come in to pick up her medications, she had arrived after 5:00 p.m., and the medications could not be issued. (R. at 404.) Thereafter, she declined to retrieve her medications after being informed that a urine drug screen would be performed prior to receiving them. (R. at 404.) On September 28, 2009, Blanken called her case manager, stating that she had found her medications. (R. at 403.) Subsequently, Blanken missed several appointments with her case manager and/or Dr. Bass. (R. at 400-03.)

When Blanken presented to the emergency department at Lonesome Pine Hospital on November 8, 2009, her mood and affect were deemed normal, and she was fully oriented. (R. at 462.)

When Blanken returned to see Austin on November 16, 2009, she reported not doing well, stating that she had been out of Seroquel and Cymbalta for about two weeks and that she had stopped taking the Depakote due to negative side effects. (R. at 398-400.) Blanken reported mood swings and becoming very nervous without her medications. (R. at 399.) She stated that she had taken Lortab for severe headaches, and she stated that she had smoked marijuana and taken

-12-

Ritalin recently to "get up off the couch." (R. at 399.) Blanken refused to admit that she had a drug problem and refused to attend group therapy. (R. at 399.) She denied suicidal or homicidal ideations and reported no auditory or visual hallucinations. (R. at 399.) Blanken reported taking her medications as prescribed until she ran out. (R. at 399.) On mental status examination, she was alert and fully oriented, her speech was clear and coherent, thoughts were logical and organized, but she was very guarded with responses. (R. at 399.) Blanken's mood was angry and anxious with a congruent affect, and she was evasive with eye contact, but conversed with the case managers. (R. at 399.) A drug screen performed on November 16, 2009, was positive for benzodiazepines. (R. at 400.) Blanken became angry and walked out when informed that her medications would not be released to her due to the positive drug screen. (R. at 399.)

On November 23, 2009, Blanken's mother called to inform her case manager that Blanken was incarcerated. (R. at 398.) Blanken saw Dr. Bass on December 3, 2009, reporting not doing well on her medication regimen. (R. at 394.) She attributed her recent incarceration to her bipolar disorder, and she justified her use of marijuana, Lortab and Klonopin due to the lack of prescription medication. (R. at 394.) She appeared agitated, was tense and red in the face and appeared to be under the influence. (R. at 394-95.) Blanken again denied having a drug problem and relayed concern that this would prevent her from getting SSI benefits. (R. at 395.) A rapid urine drug screen indicated Suboxone, opiates, cannabis and benzodiazepines. (R. at 395.) She was advised that her continued receipt of psychotropic medications was dependent upon appointment compliance, urine drug screens, attendance with case management, participation in substance abuse group and counseling, participation in prescription monitoring program and being open about her history as opposed to continuing to avoid answering Dr.

-13-

Bass's questions. (R. at 395.) Blanken made good eye contact, had normal speech, exhibited normal psychomotor activity, presented with no symptoms of psychosis and showed no change in cognitive function. (R. at 395.) She established no rapport, was defensive, provided inadequate answers to questions, was evasive and guarded and exhibited an agitated mood with congruent affect. (R. at 395.) Blanken showed no adverse effects of medication, no evidence suggesting any misuse of medication and no dangerousness to herself or others. (R. at 395.) Blanken was diagnosed with a combination of drug dependence, excluding opioid type drug, unspecified; and long-term, current, use of other medications. (R. at 395.) Changes to her diagnoses included substance induced mood disorder; polysubstance dependence; and rule out alcohol dependence. (R. at 396.) She received a two-week supply of Seroquel and Cymbalta samples. (R. at 395-96.)

On January 5, 2010, Blanken advised her case manager that she had been to court on a malicious bodily wounding charge after hitting her husband with a vehicle. (R. at 393.) On February 28, 2010, after Blanken failed to show up for scheduled appointments, she was discharged for noncompliance. (R. at 393.) On that date, her diagnoses were polysubstance dependence; a mood disorder, not otherwise specified; and alcohol dependence; and her then-current GAF score was placed at 30. (R. at 413, 415.)

Blanken saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, on March 30, 2010, for a psychological evaluation at the request of Virginia Department of Rehabilitative Services. (R. at 420-25.) She was fully oriented. (R. at 420.) Blanken reported using illicit drugs in the past and stated that she preferred "downers." (R. at 422.) She stated that she began using alcohol as a teenager following her parents' divorce. (R. at 422.) Blanken stated that her father, who was

the principal of a local school, frequently pulled guns and "beat the hell out of everybody." (R. at 422.) According to Blanken, all of these things were "looked over" by others, including family members, due to their social position. (R. at 422-23.) Blanken stated she last drank alcohol on New Year's Eve. (R. at 423.) At the peak of her drinking, she was drinking a case of beer on a near daily basis. (R. at 423.) Blanken reported having received psychiatric treatment and counseling services previously, but had not done so since August 2009, when she lost her insurance. (R. at 423.) Blanken stated that she was able to perform household chores and grocery shop, and she socialized with her son and two friends and enjoyed reading. (R. at 423.)

Blanken's affect was described as "somewhat mixed," and she presented with a rather "sour and dour" manner, frequently complaining during the interview. (R. at 423.) Her speech was clear and intelligible. (R. at 423.) Blanken denied visual hallucinations, but stated that she heard "chanting." (R. at 423.) She had no signs of ongoing delusional thinking. (R. at 423.) Blanken reported becoming depressed as a child, which she attributed to her father's abusiveness. (R. at 424.) She stated that she often was irritable and described herself as very moody. (R. at 424.) Blanken reported daily suicidal ideation, but no plans or intent. (R. at 424.) She reported sticking herself with pins when she was younger, but reported that she had had not done this for some time. (R. at 424.) Blanken indicated that her memory, particularly short-term, was somewhat poor. (R. at 424.) She indicated that her concentration was erratic and that she frequently was distractible. (R. at 424.) Blanken indicated that her mind "race[d]," but she denied frequent crying spells. (R. at 424.) She reported experiencing manic episodes monthly, lasting from three to four days. (R. at 424.) Blanken stated that she could go from calm to rather angry fairly rapidly. (R. at 424.) She further reported having panic attacks since

-15-

childhood, which occurred four days a week and lasted from two to five minutes. (R. at 424.) She stated that she was physically abused by her second husband and had been raped by a friend of a friend. (R. at 424.)

Lanthorn opined that Blanken was functioning in the low average range of intelligence. (R. at 425.) He diagnosed major depressive disorder, recurrent, moderate to severe; rule out bipolar disorder, not otherwise specified; alcohol dependence in early full remission; rule out polysubstance dependence in some stage of remission; and borderline personality disorder; and he assessed her then-current GAF score at 60. (R. at 425.) He deemed her psychological prognosis to be somewhat guarded, and he concluded that she needed to reestablish psychotherapeutic and psychiatric relationships with mental health professionals as soon as possible. (R. at 425.) Lanthorn concluded that Blanken would have no limitations in learning simple and moderately complicated workplace tasks, mild limitations sustaining concentration and persisting at tasks in an effective fashion, mild to moderate limitations at times interacting with others in the workplace to include co-workers, the general public and supervisors and mild limitations dealing with changes and requirements of the workplace. (R. at 425.)

On April 12, 2010, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Blanken was moderately restricted in her activities of daily living, had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced one or two repeated episodes of decompensation, each of extended duration. (R. at 108.) Jennings also completed a Mental Residual Functional Capacity Assessment, finding that Blanken was moderately limited in her ability to carry out detailed instructions, to maintain attention and

concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. at 109-11.)  Jennings further found that Blanken was moderately limited in her ability to interact appropriately with the general public.  (R. at 110.)  Jennings concluded that Blanken could perform simple, unskilled nonstressful work and should have no limitations learning simple and moderately complicated tasks in the workplace.  (R. at 111.)

On June 15, 2010, Blanken saw Dr. Uzma Ehtesham, M.D., a psychiatrist, with complaints of increased depression, mood swings and hyperactivity.  (R. at 426-27.)  Her anxiety was rated a three on a 10-point scale, and she endorsed auditory and visual hallucinations.  (R. at 427.)  Blanken maintained eye contact, displayed an anxious affect with congruent mood, denied suicidal and homicidal ideations, and her insight was fair.  (R. at 427.)  Dr. Ehtesham noted that Blanken's visual hallucinations and paranoia were increased, and she initiated Geodon and Seroquel XR.  (R. at 428.)

On June 24, 2010, Joseph Leizer, Ph.D., a state agency psychologist, completed another PRTF, and Mental Residual Functional Capacity Assessment in which he echoed the findings of state agency psychologist Jennings, with the exception that he did not address Blanken's ability to understand and remember detailed instructions, which Jennings found moderately limited.  (R. at 120-23.)

Dr. Ehtesham completed a mental assessment of Blanken on August 18, 2010, finding that she had a seriously limited ability to follow work rules, to

interact with supervisors, to understand, remember and carry out complex job instructions and to maintain personal appearance. (R. at 429-31.) She further found that Blanken had no useful ability to relate to co-workers, to deal with the public, to use judgment, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out both detailed and simple job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 429-30.) Dr. Ehtesham based these limitations on Blanken's anger and mood swings and decreased concentration. (R. at 429-30.) She concluded that Blanken was permanently disabled. (R. at 431.)

On September 23, 2010, Blanken reported worsened mood swings, and she was sad, agitated and paranoid. (R. at 491.) Her anxiety was rated a five. (R. at 491.) She exhibited an anxious affect with congruent mood, reported auditory and visual hallucinations, but denied suicidal or homicidal ideations, as well as delusions, and there was no evidence of mania. (R. at 491.) Blanken's insight was fair, and her judgment was intact. (R. at 491.) Dr. Ehtesham prescribed Geodon and Seroquel. (R. at 492.)

When Blanken presented to the emergency department at Lonesome Pine Hospital on October 4, 2010, and again on October 19, 2010, her mood and affect were deemed normal. (R. at 435, 448.)

Blanken again presented for treatment at Addiction Recovery of East Tennessee on August 23, 2010. (R. at 468-79.) A urine drug screen was positive for benzodiazepines and buprenorphine. (R. at 469.) Blanken admitted illicit use of hydrocodone, Xanax, Klonopin, Valium, marijuana, cocaine and alcohol. (R. at

-18-

470.)  She reported that she was then-currently prescribed Seroquel, Geodon and Cymbalta.  (R. at 471.)  Blanken was scheduled for treatment on a weekly basis. (R. at 471.)  She was treated with Suboxone, Subutex and Tranxene.  (R. at 475-79.)

Blanken continued to see Dr. Ehtesham from October 19, 2010, through November 11, 2011.  (R. at 481-90.)  Over this time, Blanken was described as sad, anxious, agitated and paranoid.  (R. at 481, 483, 485, 487, 489.)  She endorsed auditory and visual hallucinations, but no delusions were elicited.  (R. at 483, 485, 487, 489.)  During this time, Blanken rated her anxiety between a five and an eight, her depression between a three and a six and her mania as an eight.  (R. at 481, 483, 485, 487, 489.) Dr. Ehtesham prescribed various psychotropic medications, including Celexa, Seroquel, Klonopin, lithium, Lamictal, Haldol, Geodon, Zyprexa and Amitriptyline.  (R. at 481-90.)  On June 15, 2011, Dr. Ehtesham reported that Blanken was doing well on Haldol and lithium despite continued anxiety.  (R. at 485.) On September 6, 2011, when Blanken reported being out of lithium for two weeks, she noted increased depression and that she was experiencing panic attacks. (R. at 483.)  On November 11, 2011, she reported lessened mood swings. (R. at 481.)

On November 14, 2011, Dr. Ehtesham completed another mental assessment, finding that Blanken had a seriously limited ability to follow work rules and to behave in an emotionally stable manner. (R. at 495-97.) She found that Blanken had no useful ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out simple, detailed or complex job instructions, to maintain personal

-19-

appearance, to relate predictably in social situations, and to demonstrate reliability. (R. at 495-96.) Dr. Ehtesham based these findings on Blanken's severe problems with concentration and her panic attacks. (R. at 496.) She deemed her permanently disabled. (R. at 497.)

On November 25, 2011, Blanken saw Robert S. Spangler, Ed.D., a licensed psychologist, for an evaluation at the request of her attorney. (R. at 498-501.) Blanken generally understood the instructions for each task, but demonstrated erratic concentration secondary to anxiety level. (R. at 498.) She was appropriately persistent on tasks, but her pace was impacted by intrusive stimuli and anxiety level. (R. at 498.) On mental status examination, Blanken's mood was anxious and depressed with congruent affect. (R. at 499.) She was alert and fully oriented with adequate recall of remote and recent events. (R. at 499.) She exhibited fair eye contact, but tense motor activity. (R. at 499.) Her judgment and insight were consistent with borderline to low average intelligence, associations were logical, thought content was nonpsychotic, and no perceptual abnormalities were noted. (R. at 499.) Blanken was deemed emotionally labile secondary to nightmares, flashbacks and mood swings. (R. at 499.) She denied suicidal and homicidal ideations, and delusional thought was not evident. (R. at 499.) She was deemed credible. (R. at 499.) Spangler deemed Blanken's social skills adequate, as she did relate well to him. (R. at 499.) He noted, however, that she decompensated rapidly when stressed or recalling past abuse. (R. at 499.) Spangler found that Blanken did not have the judgment or skills necessary to handle her financial affairs if awarded benefits. (R. at 499.)

Spangler administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), the Wide Range Achievement Test – Fourth Edition,

("WRAT-4"), and the Bender Visual Motor Gestalt Test. (R. at 500.) Blanken obtained a full-scale IQ score of 72 on the WAIS-IV, placing her in the low borderline range of intelligence. (R. at 500.) The WRAT-4 results were partially consistent with the WAIS-IV results, yielding a score in the 10.2 grade level in word reading, the 8.1 grade level in sentence comprehension and the 3.5 grade level in arithmetic computation. (R. at 500.) Blanken's drawings of the Bender designs indicated the presence of organicity. (R. at 500.) She earned a severe rating using the Watkins Scoring System. (R. at 500.) Her pace was inadequate as objectively tested. (R. at 500.) Spangler diagnosed bipolar I disorder, currently depressed, moderate on prescription medications; PTSD, severe; alcohol abuse in full remission by report; nicotine dependence; low borderline intelligence; limited education reading skills and comprehension; marginal education math skills; erratic concentration, mild to moderate; visual perception disorder, severe, with probable organicity; and personality disorder, borderline, moderate to severe; and he placed her then-current GAF score at 50. (R. at 501.) Spangler deemed Blanken's prognosis as guarded, noting the need to receive regular mental health treatment with Dr. Ehtesham and get in a PTSD group. (R. at 501.) He further noted that the personality disorder would be highly resistant to treatment. (R. at 501.)

Spangler also completed a mental assessment, finding that Blanken had a seriously limited ability to follow work rules, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 502-04.) He found that Blanken had no useful ability to relate to co-workers, to deal with the public, to use judgment, to deal with work stresses, to understand, remember and carry out both detailed and complex job instructions,

-21-

to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 502-03.) Spangler found that all work-related activities were impacted significantly by severe anxiety and moderate depression and mood swings on prescription medications. (R. at 504.) He opined that Blanken's impairments might meet listing § 12.04, § 12.06 and, perhaps, § 12.08. (R. at 504.) Spangler found that Blanken could not manage benefits in her own best interest and would miss more than three days of work monthly. (R. at 504.)

Blanken continued to treat with Dr. Ehtesham from December 26, 2011, through April 31, 2012. (R. at 538-39, 541-44.) Over this time, Blanken again was described as sad, anxious, agitated and paranoid. (R. at 538, 541-42.) She rated both her anxiety and depression between a five and an eight and her mania an eight. (R. at 538, 541-42.) On December 26, 2011, Blanken stated that she was angrier and more irritable, and on April 3, 2012, she reported intensified depression. (R. at 538, 541.) Dr. Ehtesham prescribed Klonopin, lithium, Lamictal and Haldol over this time. (R. at 538-39, 541-44.)

On June 12, 2012, Dr. Ehtesham completed a third mental assessment, finding that Blanken had a seriously limited ability to deal with work stresses and to understand, remember and carry out complex job instructions. (R. at 545-47.) She found that Blanken had no useful ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out both simple and detailed job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 545-46.) Dr. Ehtesham opined that Blanken would miss more than two workdays monthly. (R.

-22-

at 547.) She based these findings on Blanken's severe bipolar diagnosis, intense anger, psychosis and need for hospitalization at times. (R. at 545.) She further based her findings on Blanken's panic attacks and severe confusion. (R. at 546.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2014); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2014).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2014); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

-23-

Blanken argues that the ALJ improperly determined her mental residual functional capacity by failing to adhere to the treating physician rule and accord controlling weight to the opinion of Dr. Ehtesham and by failing to give full consideration to the findings of Spangler. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-7.) As noted above, Blanken does not challenge the ALJ's findings as to her physical impairments or her physical residual functional capacity.

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

-24-

After a complete review of the evidence of record, I find Blanken's arguments unpersuasive. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 416.927(c)(2) (2014). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's decisions to not give controlling weight to the opinion of Dr. Ehtesham and to give little weight to the opinion of Spangler. The ALJ noted that he was giving little weight to Dr. Ehtesham's opinions because they were inconsistent with the other evidence of record. For instance, Dr. Ehtesham noted that Blanken did not have any substance abuse problems. However, the record is replete with evidence to the contrary. While Blanken argues that Dr. Ehtesham was referencing that she had no then-current substance abuse problems, the court finds this argument unpersuasive. Specifically, Dr. Ehtesham noted on June 15, 2010; September 23, 2010; October 19, 2010; March 15, 2011; June 15, 2011; September 6, 2011; December 26, 2011; and April 3, 2012; that Blanken had consumed no alcohol, had no recent drug abuse or recent cravings. This is eight of the 10 visits Blanken had with Dr. Ehtesham. On the other two visits, Dr.

-25-

Ehtesham did not note that Blanken was drinking, using drugs or experiencing cravings, but she simply left the questions blank. The record before the court undoubtedly demonstrates that Blanken has a long history of substance abuse and was continuing to abuse substances during the time she was treating with Dr. Ehtesham. For instance, on August 23, 2010, Blanken presented to a rehab facility for substance abuse treatment, at which time she admitted to using hydrocodone, and Valium that day, marijuana weekly, consuming a case of alcohol daily and having used cocaine six weeks previously. (R. at 470.) Blanken received treatment through May 2011. Without taking into consideration Blanken's continued heavy drug use, the credibility of Dr. Ehtesham's opinions is called into question. Further, the court finds curious that in two of the three mental assessments completed by Dr. Ehtesham, she inexplicably found that Blanken had a seriously limited ability to understand, remember and carry out complex job instructions, while she had no useful ability to understand, remember and carry out both simple and detailed job instructions. Such a finding is illogical, and Dr. Ehtesham makes no attempt to explain any reasoning therefor. Again, such findings call into doubt the credibility of her opinions.

Lastly, I find that the other substantial evidence of record does not support Dr. Ehtesham's opinions. For instance, the state agency psychologists opined that Blanken could perform simple, unskilled nonstressful work and should have no difficulty learning moderately complicated tasks in the workplace. Additionally, psychologist Lanthorn concluded that Blanken would have no limitations sustaining concentration and pace and persisting at tasks in an effective fashion, mild to moderate limitations at times interacting with others in the workplace to include co-workers, the general public and supervisors and mild limitations dealing with changes and requirements of the workplace. Furthermore, when Blanken saw

her case manager at Wise County Behavioral Health Services in November 2009, she was alert and fully oriented with clear and coherent speech. Her thoughts were logical and organized, and she conversed with the case managers. In December 2009, despite being agitated and angry when informed that the continued receipt of psychotropic medications would be dependent on certain conditions, including urine drug screens, Blanken's speech and psychomotor activity were normal, and she exhibited no symptoms of psychosis or change in cognitive behavior. Blanken's mood and affect were deemed normal upon presentation to the emergency department on two occasions in October 2010. In November 2011, she was alert and fully oriented with adequate recall of recent and remote events. Associations were logical, thought content was nonpsychotic, and no perceptual abnormalities were noted. No delusional thought was evident, and Blanken's social skills were deemed adequate.

As for psychologist Spangler, I first note the Commissioner's mischaracterization of his opinion as being largely based on Blanken's self-reports and subjective complaints. As Blanken argues in her brief, Spangler reviewed her medical records, conducted a clinical interview and administered various psychological tests. That being said, I, nonetheless, find that substantial evidence supports the ALJ's decision to accord little weight to Spangler's opinion. First, for all the same reasons enumerated above, the opinion is inconsistent with the evidence of record as a whole. Additionally, as pointed out by the Commissioner, some of Spangler's findings are directly contradicted by Lanthorn's. For instance, during the mental status examination conducted by Lanthorn, Blanken was able to perform serial 7's, and she gave higher order and correct interpretations to commonly used adages. She could recall five digits both forwards and backwards. However, during the mental status examination performed by Spangler, she could

not perform serial 7's or serial 3's, and she could not interpret common proverbs adequately. The court notes its curiosity that Blanken was unable to do these things at the evaluation arranged by her attorney. Even when Blanken was treated at Ridgeview on a temporary detention order for positive suicidal ideations in July 2009, she could perform serial 3's and interpret proverbs correctly. Lastly, the undersigned has considered that Spangler was not a treating source, but saw Blanken on only one occasion, not for purposes of treating her, but for the purpose of gaining information for her disability case.

It is for all of these reasons stated herein that I find that substantial evidence supports the ALJ's weighing of the psychological evidence. That being so, I further find that substantial evidence supports the ALJ's finding as to Blanken's mental residual functional capacity and his finding that she was not disabled. An appropriate order and judgment will be entered.

DATED: February 12, 2015.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE